This morning is agenda number two, case number 105-340, people of the state of Illinois versus Brian Nelson. Council may approach the bench. Good morning, your honors. My name is Steve Clark. I'm privileged to be here this morning representing Brian Nelson. I'm going to argue two sentencing issues this morning. I'd like to start with the question of whether it was unfair for the judge to remove a juror who voted against the death penalty from the jury and then ceded an alternate and allowed that jury to begin deliberations anew. It is my contention that that action on the facts of this case violated due process of law and the Eighth Amendment. I'm relying on an Illinois appellate court case, three Federal Circuit Court of Appeals decisions, and Supreme Court decisions from the states of California, Washington, Colorado, and Indiana, all of whom have enunciated a prophylactic due process rule that before a holdout juror may be removed from a deliberating jury, the judge must make a determination that there is no reasonable possibility that the holdout was dismissed based on his or her view of the merits of the case. Now, most of the cases I just referenced, including the appellate court case from Illinois, Galano, arise at the trial deliberations. And this case is different from those only in the sense that here we have a death penalty sentencing decision by the jury, and it takes only one juror to spare Brian Nelson's life, whereas in the trial context the interest is in the unanimity or avoiding a hung jury. Mr. Clark, does this issue hinge on whether this court views this juror as having a predetermined view that the death penalty was inappropriate? Predetermined is the key word in that question. If the juror had predetermined before he was selected to be a juror that he would not vote for the death penalty, I think that the judge's judgment would have been correct here, perhaps. But this juror didn't predetermine anything. He made a judgment based on the mitigation which he heard at the trial. And since he was instructed, and this court has held many times, that jurors may consider trial evidence as being mitigating as well as being aggravating, there was no inappropriate judgment by this juror. It was predetermined, you might use that word, in the sense that he apparently was strongly leaning, arguably even had decided against the death penalty based on the trial mitigation before he heard the aggravation. And that's what the judge here found and relied on. So the state's position then, well, you differ from the state's position, which I think was that after the guilt phase, this juror had already determined that the death penalty was inappropriate and refused to deliberate as during the sentencing phase, is that right? I don't know that I disagree with them about that. I think that's basically what the judge said. The juror who was excused said he did listen to and consider aggravation. But the judge ruled, to the degree he made any findings of fact, at the post-sentencing motion, the judge ruled that what bothered me about this guy, referring to juror 20, Mr. Cooper, was that he wouldn't listen to the aggravation. So for purposes of this analysis, I'm willing to accept that as being a factual determination. But I don't find that to be inappropriate for him not to listen to aggravation in a constitutional sense, because he was considering mitigation that he heard at trial. Namely, my client's youth, and the motivation for this crime being the emotional circumstances. Would it be inappropriate if the roles were reversed? I mean, if he determined that he, this juror determined that he would not listen to mitigation? Yes. That's a very key point. And it's one that the trial judge was mistaken about. It is a different situation for a juror to say he won't consider mitigation than it is for a juror to say he has found mitigation at trial, which makes it unnecessary for him to consider aggravation. And the difference is that there's an Eighth Amendment requirement that all of the jurors consider the mitigation. And there's an Eighth Amendment requirement that each of those 12 jurors has the right to make their own judgment about what is mitigating and how significant that mitigation is. There is no Eighth Amendment concern that jurors listen to aggravation. Or consider aggravation. So the key difference between a juror who is unwilling to consider mitigation and a juror who is arguably not considering aggravation is the Eighth Amendment right that the defendant has. How is the alternate juror impacted when he comes in and he knows that the original juror has been removed at that stage of the trial? My seventh argument is that that juror was inevitably coerced by the circumstances. In People v. Roberts decided by this court about a year before this sentencing hearing, this court held that when a guilt juror, jury, had deliberated for two hours and taken two votes, which were in favor of guilt, it was not a matter of guilt. It was inevitably coercive to see an alternate coming into that situation. And here we have the jury having deliberated for ten hours, having taken two votes where the vote was apparently 11 to 1 in favor of the death penalty. The jurors were going to, three of the jurors were interviewed by the judge. It became clear to the judge and everyone, including all the jurors, that what the numerical split was. And so it was inevitably coercive for an alternate to come into that setting where 11 jurors had struggled to get rid of the holdout. They had succeeded, and the trial judge had, although he instructed them to restart their deliberations, he also said to them that they had succeeded. And don't forget, I've got another alternate that is yet to be seated that I can use. Was that argument on coerciveness of the alternate applied to any alternate at any stage of trial, but with lesser degree, with less effect? I'm not sure I understand your question, Justice Freeman. Was that applied to all alternates, the coercive effect, no matter which stage the trial is in? Yes, if an alternate is confronted with coercive circumstances, long deliberations, votes that are dramatically one side or the other, I think the psychological studies, the jury studies show that the juror is going to be confronted with a very coercive circumstance. And unfortunately, the trial court judge here was apparently unaware of this court's decision in People v. Roberts. If he had known about it, I think that he would have declared a mistrial rather than seat an alternate juror. Because he could have had a whole new sentencing hearing. What about, Mr. Clark, the third note from the foreperson, and in that note he said that Juror 20 had stated to more than one juror, when they decided on eligibility, that he would not decide on the death penalty. And then later, I think it was in questioning, the foreperson said that after voting for death penalty eligibility, Juror 20 said that he would not vote for the death penalty based on his beliefs, background, and the way he was raised. What impact, if any, does that have? I know there's other notes that indicate based on the evidence, I think he did say that at one point as well, or the foreperson indicated that. One of the problems we have here is that the judge didn't make very many findings of fact. But he did say that he believed that the juror had not lied to him during voir dire, when he said that he was willing to consider the death penalty. So I think that the judge, in essence, rejected that possibility. Rejected that portion of the foreperson's testimony, and essentially accepted Juror Cooper's assertion that A, he found mitigation from the trial evidence, and B, he did admit that he told the other jurors after the trial that he was reluctant, or he was not going to vote for the death penalty in light of that mitigation. So I think that the judge discounted any suggestion that this juror should have been excused under Witherspoon, for example. Now, with the court's indulgence, Just so we're clear, the standard review on this issue would be use of discretion, is that correct? No, the standard of review would be de novo. In People v. Galano, the appellate court case which I rely on, they used a de novo standard because it's a question of law, a question of constitutional law. And the Galano court cited this court's decision in People v. Burns at 209 Illinois 2nd for that standard of review. Now, I want to get back to the due process Eighth Amendment question of whether a deliberating holdout juror can be indicted. And why was he so lightly removed as he was here? The due process standard that Galano uses, whether there is any reasonable possibility that the holdout is being excused because of his position on the merits, has two important policy concerns behind it. One, most obviously, is we have to have concern that judges, prosecutors, the parties can manipulate the case. They can manipulate the composition of the jury to get the verdict they want. In Galano, for example, when it became known that one juror was holding out for not guilty, the prosecutor started investigating the man's background and found out that he had more prior convictions than he had stated during voir dire. But the appellate court here in Illinois recognized that that investigation and that excusal never would have taken place had the juror not taken a position that the defendant was not guilty. And the reason for that rule is we don't want to have judges have the power to reconfigure the 12-person jury to get what they want. And the second reason is we have to have safeguards that the secrecy of the jury deliberations, the deliberative process, is not contaminated by the judge's knowledge of what's going on. In this particular case, the judge found out what the numerical split was, why the holdout juror was favoring non-death, and the judge found out that he was not guilty. He also found out, and this is something I haven't gotten to, but I need to, he also found out that several of the jurors were refusing to follow the instruction that says, if the jury cannot unanimously agree in favor of death, you should sign the verdict that imposes the sentence other than death. The judge stated at page 5052 of his sentence, that he was not guilty. And he said, I'm not sure if the refusal to sign either verdict form means the court must impose a sentence or order a new sentencing hearing or question the jurors and seize an alternate jury. And the judge ultimately chose the third option, but it's my position that what the judge should have done here is followed the statute, followed the jury instructions, and once he was satisfied that there were alternatives, he should have signed the verdict. If there were 11 jurors in favor of death and one juror who was not in favor of death and wouldn't sign the unanimous verdict, he should have directed a sentence of life in prison, which was the mandatory alternative to death here, because you can't have 11 members of the jury controlling the question of what sentence is imposed, because the statute says it only imposes the sentence. It only takes one to save a life. Now, it's important that this case give guidance to the trial courts as to what this judge should have done in this particular set of circumstances. The trial judge put the onus of misconduct or something on the jury. The jury should not know that this judge is not guilty of misconduct. But it's my contention that the jurors who refused to follow the instructions to sign the non-unanimous verdict were also guilty of some level of misconduct. And the circuit court judges need to know how to deal with a situation where the jurors are at loggerheads. And I think the answer is, since the legislature in the Death Penalty Act provided that it takes a unanimous verdict to get death, when we have one juror who gallantly holds out for mercy for my client, the solution should have been a directed verdict of non-death. And I'm asking this court to recognize that that vote against death constituted a verdict in my client's favor, and that it would be a double jeopardy violation, because we have the equivalent of an acquittal on the question of life or death here, for this court to send this case back for a new trial, and we have a process violation here. Mr. Clark, did Juror 20 ever indicate what piece or pieces of evidence came out of the trial that persuaded? No. He just stated that based on what he heard at the trial, he felt that the death penalty was not appropriate. He didn't say, so and so's testimony. He didn't say, this juror happened to be 20 years old. My client's 19. Maybe he identified with the boy's youth. He didn't say, I've been dumped by girlfriends, and it's hard to take. But that also could have been a mitigating circumstance. This case has a lot of similarities to the cases where this court has held the death penalty excessive, because almost all of those cases  were devastated by the breakup of his relationship, and that's what apparently caused this crime. Did this juror say at some point that it had to do with the way he was raised, or he didn't believe in it? How does that fit in with your analysis? It depends on which juror you believe. One juror said that he said something like that. Juror Cooper said, well, that's not entirely true, but you do bring your life experiences with you and how you were raised as part of it when you evaluate the appropriateness of something like the death penalty. But the judge didn't make a finding of fact that the juror said that or that that was in his favor. So it's not clear exactly what he said about the way he was raised. Going back to your similar cases where the person has a breakup, I mean, those cases didn't involve multiple murders. Oh, sure they did. The Carlson case involved the murder of the wife that was divorcing Mr. Carlson, and then he shot a police officer and killed him. Not exactly. The Buggs case involved the murder of three people in an arson after Mr. Buggs' wife rejected him. The Ledger case, which I argued before this court 25 years ago, involved the murder of his two ex-wives in the attempt to murder the husband of one of his ex-wives. I grant you we have four murders here, but that's not really a very compelling distinction versus three murders. Counsel, so I'm clear, and I think you said this, what we are asked to do by you is to remand this case for a new sentencing hearing. Is that accurate? That would be accurate as to Issue 7. As to Issue 6, which I spent most of my time on, I'm asking you to impose a natural light sentence, because I believe that my client was entitled to the vote of Juror 20. Thank you. If there are no other questions, I'll take a seat. Thank you. Good morning, Your Honors, Counsel, and may it please the Court, I'm Assistant Attorney General Carl Treble representing the people of Illinois. The record in this case provides compelling evidence that the defendant intentionally killed four people, tried to cover up his crimes, and the aggravating evidence is compelling in this case and shows that the death penalty was appropriate. I wanted to start off with the standard of review question that Justice Garmon asked. And I think it's telling that even counsel argued that it depends on the evidence that the defendant has. It depends on which juror you believe. That shows that the underlying question here is a factual question, which is always entitled to deference, because the person that's best suited to determine what actually happened and who to believe is the trial court that actually conducted the inquiry. Now, it's true that Juror Number 20 made some statements that might show that he listened to some of the evidence. But he also made statements that even he admitted, he had said as early as the guilt phase of the trial, that he had predetermined his verdict and that no matter what, he would not instill the death penalty. Even he admitted that this was at least based in part on how he was raised. The other juror said that he went much further. Juror Number 41 and the jury four person both told the trial court that he had predetermined his verdict. And that he had said that no matter what, he was not going to instill the death penalty at that phase. And then again at the eligibility phase, he said he wasn't going any further. And then every single day of the third phase of the trial, he said over and over again, it doesn't matter what this evidence is, I'm going to vote the way I'm going to vote. And I'm paraphrasing there, of course. So it comes down to a credibility determination. Do you believe Juror Number 20 or do you believe Juror Number 41 and the jury four person? And again, counsel admits that it comes down to who do you believe. And our position is the trial court was in the best position to look at the different testimonies, the different answers to his inquiries and determine that the jury four person and juror number 41 were the ones telling the truth. And even the judge, the judge was obviously struggling with this issue. Because he recognized that defendant is correct. That if he was just a holdout juror and that's all it was, then it would be improper to remove him. Simply because he was basing it on the evidence. But the evidence indicated that's not what he was doing. And the further answers to inquiries, the trial court found that out. And the trial court made a particular mention that he was concerned that there might be just simple animosity between disagreeing jurors when it came to the notes from juror number 41 versus juror number 20. But then stated after hearing from the jury four person that he felt like the jury four person was very credible, that she was being very conscientious and that she had separated herself from that type of animosity. And that credibility determination is entitled to strong deference. Because all we're reviewing here is a naked record. All we can do is read the transcripts. The trial court was in a position to actually judge the 80 percent of communication that is told by body language and nonverbal communication. So we need to defer to that judgment in that case like we would in any other case where the trier effect is making a credibility determination. Once we've determined that, then it comes down to a legal issue. And that's where this court needs to offer guidance, is what should trial courts do when they're faced with a biased juror who has been found to be so biased that he refuses to listen to evidence at a major stage of the trial? We believe that the trial court did the right thing in this case because as the Supreme Court's noted in Morgan v. Illinois, both the prosecution and the defense are entitled to a fair trial. And to have a juror on there who is able to refuse to listen to evidence and come up with his own verdict after not hearing any of the aggravating evidence at all, is unfair to the people. And indeed, sets a frightening precedent that will encourage advocates who would refuse to instill a death penalty in any circumstance to try to get on jury panels and to try to get into this same circumstance and disregard any of the evidence and just go ahead and vote against the death penalty no matter what. And that would go directly contrary to Illinois law. So, that's why the standard overview in this case should be an abusive discussion standard on the factual determination and then the ultimate legal conclusion, of course, of whether or not a biased juror should be removed is entitled to de novo review. Defendant cites to Roberts, but this case is not Roberts. The coercion element in Roberts was not the fact that an alternate was being used to put into a situation where 11 people had already deliberated. As Justice Freeman hinted at, that situation would come up any time an alternate is seated. And that can't be the level of coercion that Roberts was talking about. So, it's important to look at what were the facts of Roberts. In Roberts, the defendant had made threats and intimidated one of the jurors. And she had been so concerned about it that that's why she had initially decided to vote not guilty. And the other jurors on the panel, particularly the female ones, were aware of this. And the concern in Roberts was that the residual bias, the residual fear might be that they would go automatically towards a guilty verdict based on the fact that this defendant had made threats towards a juror. So, it wasn't the fact that a new juror was coming in. It was the fact that the 11 remaining jurors were aware that that 12th juror, the original 12th juror had been threatened. That's not the case here at all. In this case, of course, the other jurors were aware that juror number 20 was biased and that he was refusing to listen to evidence. But that didn't color their view of the defense. And that's shown through a couple of things. One thing I tried to make counsel aware of before argument here today is going over this this weekend in preparation for argument, we now know from page C1661 of the record, which is the docket sheets of the trial court, that the newly constituted jury deliberated for three hours and 19 minutes. And we also know from the record on appeal, as both parties noted, that the newly reconstituted jury requested trial transcripts when they were deliberating. So, that shows that they didn't just strong arm this nude alternate juror into coming up with an immediate verdict. But they took their time to look at the facts anew and determine whether or not the death penalty was valid. And whether or not it was appropriate. The defendant stated that this case was different because there was mitigating evidence at trial and that it was proper to go ahead and base a no death penalty verdict just on that. But he's failed to state anywhere in the record where juror number 20 cited to any mitigating evidence. It wasn't a situation where juror number 20 had said, I've heard sufficient mitigating evidence at the trial stage and therefore I'm going to vote against the death penalty. Instead, what he said is, I'm refusing to listen to any aggravating or mitigating evidence. And as the trial court noted, if a juror had said that and we didn't know which way he was intending to vote, but he was just saying, no matter what, I'm not listening to the evidence, I've already made up my mind. Or if it was a situation where we knew that no matter what he was voting for the death penalty, it would also be appropriate for the trial court to go ahead and remove that juror. I also wanted to touch on some other issues if there were no other questions about the juror number 20 issue. One of the issues in the briefs was whether or not the Fox complaint should have come in. And the trial court did not abuse its discretion by excluding the Fox complaint. Again, this is an abuse of discretion standard even though there are constitutional implications. Ohio v. Roberts was obviously overruled on other grounds by Crawford v. Texas, but its fundamental earlier holding that this was an abuse of discretion standard was not, as defendant contends, overturned by Crawford v. Texas. Crawford v. Texas doesn't say anything about the standard of review. And in any event, in this case, the evidence in the Fox complaint was much more prejudicial than it was probative because the facts alleged in that complaint were so much different than the facts of this police interview. In this police interview, defendant admits at page 1397 of the record that there was no abusive police behavior. They were not yelling or screaming at him. The officers fed him pizza and soda pop, and he says that, the officers didn't say this, but he says that he even took naps during the period of time where he was in the interview room. Even in his own words, he says he was in the interview room from about 1030 in the morning until about 4 or 5 at night. And on page 1400 of the record, he says most of that time he was not in the interview room. He was not actually talking to the police. From the record, we know that he was interviewed from about 1115 in the morning, and there were some breaks, but until about 341 p.m., and that's at page 777 through 78 of the record. So overall, the police questioning in this case didn't take more than three or four hours, much of which was videotaped at the end. On the Fox matter, is it your position that a complaint is never a sufficient basis to cross-examine the detective's civil complaint? Our position isn't that it's never. Our position is that it's a case-by-case, fact-by-fact determination by the trial court, which is entitled to deference. And our position is, in this case, yes. The facts of the two allegations were so much different. That there was no basis to cross-examine the officers on the Fox complaint. And in any event, even if this court ultimately disagrees with that proposition, the failure to admit the Fox complaint would be completely harmless because the facts are so much different. He was interviewed for such a short time that this is not like the Fox complaint. In the Fox complaint, they said there was over 850 minutes of intense police interrogation. They told him that his wife and his father had abandoned them because he was so obviously guilty. They had physically coerced him. They were yelling at him, they were screaming at him. They gave him what they said was a lie detector test and told him that he was failing that and yelled at him about that. He was sleep-deprived. None of those allegations are similar to what happened in this police interview, even by defendant's own words. And it's important to remember, in his original motion to suppress the confession, all he had said was, primarily it was that he wasn't properly Mirandized and the trial court had rejected that properly. And he's not even raising that on appeal. So because the facts were so much different, even if the jury had presented with cross-examination on the Fox complaint, the jury would ultimately conclude that because the facts were so much different, it didn't have any persuasive value and it wouldn't alter the officer's testimony. His brief makes, defendant's brief makes much to do about the fact that there was an interrogation technique that took place here and that the officers had a theme of appealing to his love of the deceased. And of course there's going to be similarities between any two police interviews. What the interrogation techniques here that are described are something that's found now in every modern police interview. The police go in with a plan, they try to establish a baseline to determine whether or not the person that they're interviewing exhibits the physical signs that most people exhibit when they're either remembering something or when they're trying to think of something and they use that information in their later questioning to determine whether or not the person's telling the truth. There's nothing improper in that and there's nothing improper in having a theme when talking to the person about having a love for the deceased and how they should go ahead and tell the police what happened. That leads into the next issue in the briefs, which is whether or not the GSS test results should have been admitted. Here, like in People v. Bennett, another case that we cited, the expert had been wanting to testify that the defendant fell into the 99th percentile under this test of suggestibility. But for the same reasoning in People v. Bennett, it was inappropriate to allow the jury to hear this expert testimony. Because it was something that the jury could, through their common sense in life experience, understand and determine whether or not the defendant in this case was particularly susceptible. They had full testimony from the officers about the conditions of the questioning and they didn't hear any evidence at all and the defendant has never presented any evidence at all that there was any particular thing that they had suggested to him in those interviews. The defendant makes much of the fact that they knew that the officers had gone to the crime scene and seen the bodies before they had come back and interviewed the defendant and that they had talked to their technical specialists who were on the scene doing the investigation at the time. But there's several inconsistencies that undermine that argument. First of all, the most obvious wounds to Gene Bookwalter and to Harold Tennant were gaping knife wounds in their torsos and your honors can see that through reviewing the exhibits of the pictures that were taken at the crime scene immediately after the bodies were found. If the police had been trying to suggest to a defendant how he had killed those two victims, the first thing they would have gone to is said, you stabbed them, didn't you? You stabbed them with a knife. But his confession doesn't contain any mention of the knife, which shows that the police officers were not feeding him information on what to say in his confession. Also, if your honors look at the video of the crime scene and the photographs of the crime scene, the room where Eric Tennant's body was found was incredibly badly damaged and it's very difficult to tell that there's even a human body in that recliner. There's no way an officer on the scene could have immediately determined the cause of death and could have fed that information to the defendant who was being interviewed while the house was still smoldering from the fire that morning. The cause of Eric Tennant's death was not determined until a later forensic autopsy. This court, I think, in Donaldson, defined the Frye standard. Did the trial court here misapply those standards? They definitely misstated it and that's why we didn't contend that in our brief. But, again, this court can uphold the trial court's determination for any reason found in the record. And I think what the trial court was trying to get at is what the argument was in People v. Bennett. The trial court just slightly misstated it to make it sound like a Frye plus reliability test. What the trial court was really getting at was the fact that this was irrelevant expert testimony because, for the reasons I just discussed, any juror could determine whether or not this defendant was particularly susceptible to a police interrogation based on the fact that they saw the police interview themselves and they heard testimony about the conditions that were present when the police interviewed them. And, again, even if this court disagrees, the error would be harmless because of the reasons I just stated. We know from the corroborating evidence that the confession that was given here was truthful. So there's no danger that he was being fed information. Another fact that shows that is the officers testified that they did a gunshot residue test of the defendant at the time they were interviewed. They were interviewing him because they didn't know that there had been no gunshots fired in this case. So the fact that they did a gunshot residue test shows they weren't feeding him predetermined information on how the killing happened. They were doing an investigation and trying to figure out exactly what happened. But I think the most telling evidence, again, is the photographs of the crime scene showing that there's no way they could have just gone and looked and determined how Eric Tennant was killed. Another issue that he talks about in his brief is that this death sentence is just fundamentally unjust. But that's, the record belies that fact. The defendant went and was rejected by Sarah Tennant again and again for a period of months. So this wasn't a sudden emotional outburst. And after that last rejection, even then, he didn't immediately act out. But he went to the basement garage and thought about what to do and ultimately grabbed a tire iron and decided to kill her. Then he didn't stop there. He went upstairs and murdered Harold Tennant and Jean Bookwalter at the top of the stairs and then didn't even stop there, but went into Eric Tennant's room where he was sleeping after working all day long on the farm, just completely exhausted and killed him by beating him in the head with a tire iron as he slept. So this wasn't the actions of someone who had just been rejected and was in the throes of dealing with that rejection and acted out of anger. He told the police he did the subsequent killings because he knew that they would know who did the murder, which even Deborah Tennant said right away to the police, well, you need to go interview the defendant in this case because he's the one that did it. So he says that was his motivation. We don't know, of course, what his true motivation was, but it appears that he murdered them because he was afraid they were going to be witnesses against him, not out of a sudden emotional outburst. The mitigating evidence in this case is not persuasive. Defendant cites a case where this court had held that it was ineffective assistance of counsel for a defense attorney to fail to present an organic brain injury mitigating evidence in a case. But that's not what happened here. What happened here was the jury heard the unpersuasive organic brain injury evidence and rejected it. And it was unpersuasive because even on cross-examination, defense experts admitted that the CAT scan was not the most reliable test, but that the MRI was more reliable and it showed a normal brain activity, that the EEG test showed a more, that it showed a normal brain activity. And also they admitted that he had had these types of obsessive, jealous, and rage-based behaviors after prior rejections long before the auto accident. So these weren't something that were caused by the auto accident. So even though there was mitigating evidence about an organic brain injury, it was not persuasive for those reasons. And based on all that information, this is not like other cases where this court has held that the death penalty was fundamentally unjust. Finally, going back to the opening and closing arguments issue that's brought up in the brief, the opening statement did go into background information on mostly the victims of this crime, although also going into the background of Deborah Tennant, who was the wife of Harold Tennant, excuse me, the ex-wife of Harold Tennant. Most of that information was just background information showing that there was a tight family bond, and the rest of it was just harmless background information. It wasn't so pervasive that the trial court abused its discretion in denying a mistrial based on that information. And also it's important for this court to hold that this issue was forfeited because defendant did not object to the opening statement at the time. He waited until after several witnesses had been called and then at a sidebar said, we're making a standing objection to the opening statement and we're moving for a mistrial. That presents the trial court with an all or nothing decision of starting over with a whole entire new jury selection or allowing an opening statement that may have wandered into some areas it shouldn't have of going forward. And that type of all or nothing decision is completely unfair to the trial court. There have been cases in the past where this court has held that forfeiture can be excused where there's a similar objection that has been made, but it's important to note that this objection didn't take place until long after the opening statements had already concluded. So it's much different than those cases. Defendant says that there were several sidebars so we don't know whether or not there was a sidebar that took place before the opening statements actually started. But all of the sidebars that were not transcribed were at least noted in the record and they all took place after the first witness had been called. There were no untranscribed sidebars that took place before or during the opening statements so it's unfair to suggest that he could have objected to this at the time and we just don't know about it. And as to the closing arguments, even if this court finds that it was improper for the prosecution to make that type of argument, it's important to remember that this is not like People v. Cuntu. The argument was cut off immediately by a defendant's objection and then the trial court properly admonished the prosecutor to cut off that line of argument. It could have perhaps been stated more elegantly or more like a textbook case in a law book but the jury saw that this line of argument was immediately cut off and was also properly instructed that opening statements and closing arguments are not evidence and should not be given any weight. So in light of all that information, it could not have been prejudicial for the prosecution to accidentally make a fleeting statement. In Cuntu, the prosecution had gone on and on and on over several sentences, several phrases about how the jury shouldn't give the defendant in that case five murders for free. Here there was just one fleeting comment about not sending a message to the jury that was immediately cut off. As far as the remaining issues in the brief, Your Honor, we would rest on the briefing on those issues unless you have any specific questions about those and we would ask that you affirm the judgment of conviction and sentence in this case. Thank you. Mr. Clark. Justice Freeman, I failed to adequately answer your question about coercive effects on alternate jurors so let me try that again. The reason this case is unusually coercive is you have a combination of factors. One, you have the long deliberations and the multiple votes that had already taken place. But more uniquely to this specific case, you have these juror interviews which had been taking place during which the jurors who were in favor of the death penalty were fighting to get rid of juror number 20. And in the course of those interactions between the judge and those jurors, it built up a concrete position in the majority that an alternate would inevitably have learned about when she came on the jury. And when the judge admonished the jury to renew their deliberations, he said, I still have another alternate left. And that sent the message to the jurors that if one of them held out, they would be replaced. So I think that was a coercive circumstance that goes well beyond the normal situation where a juror falls ill and is replaced by an alternate or the jury has a juror who's heard some extraneous evidence that has to be excused as in the Roberts case. And my opponent started out his argument by saying the abuse of discretion standard is the correct standard of review because there's these credibility determinations. But he continually ignores the due process question. And the due process standard of review is de novo because this court is in as good a position as the trial judge was not to determine what the juror was thinking or what the other jurors were thinking, but this court is in as good a position as the trial judge was to apply the due process question standard rule, which is if there's a reasonable possibility that this juror was excused because he was opposed to the death penalty based on the evidence in this case, it's a due process violation. And we know that there was more than a reasonable possibility because had Juror 20 voted for death, the judge never would have been informed that Juror 20 had made statements at the guilt deliberation stage expressing his preference against the death penalty based on the mitigation he heard at the trial. So de novo is the correct standard of review. And the correct holding in this case is that it's clear that Juror 20 was excused because of his position on the merits, not because of something he said during the trial deliberations. This factual circumstance has a lot of parallels to impeaching the verdict. Essentially, what the judge did was investigate the deliberative process here at the behest of the jurors who favored the death verdict and then send a message that he agreed with the pro-death jurors. And that's why we have a due process violation because the jury composition was changed in favor of the prosecution and denying my client that one vote that could have saved his life. Now on the Fox complaint, this is probably too complicated to cover in the next few minutes, but Mr. Fox was interrogated by a group of Will County authorities including the same two detectives who interrogated my client. And Mr. Fox made a false confession based on information which was fed to him by Will County authorities. And the similarities go beyond the same two detectives. In both cases, Mr. Fox and my client alleged that they were given false promises of leniency. If you tell us, if you confess, you'll be able to go home with your loved one who's waiting downstairs in the police department. In both cases, Mr. Fox and Mr. Nelson alleged that the detectives gave them facts that they could build their confessions on. In both cases, the detectives themselves said we tried to get the two defendants emotional by talking about how much they loved the victim, Mr. Fox's daughter and Brian's girlfriend. Trying to build up the emotions. In both cases, Mr. Fox and Mr. Nelson alleged that they asked for counsel and those requests for counsel were ignored or denied. And the significance of the civil complaint which ultimately led to a judgment in favor of Mr. Fox in federal court is that when Detective Gilfoyle testified here, he knew that he was in jeopardy in this civil case of a huge financial judgment against him. And he wanted to minimize any statements he might make which showed that it was his usual interrogative technique to use emotion, to use promises of leniency, in the accusatory stage of the interrogation to feed facts to the defendant which might be the basis of a false confession. And that fear of the civil judgment against him biased Detective Gilfoyle against talking about the accusatory stage and explaining to the ladies and gentlemen of the jury all the facts that he learned when he went to the crime scene and all the facts which he used to accuse my client of guilt and to get him to confess based on those facts. So what I'm saying is that Detective Gilfoyle had a financial interest in minimizing his explanation of his coercive interrogative techniques and that's something the jury was entitled to know. If the jury knew that they could better evaluate the defense that my client offered that his confession was false and the product of a story that was fed to him and facts that were fed to him by Detective Gilfoyle and his partner. So for those reasons I would ask that a new trial be granted. In the alternative I'm asking that this court find that there was a due process violation in excusing the one juror who could have saved my client's life in order that a life sentence be substituted for the death sentence. Thank you very much. Thank you counsel. Case number 105-340 People v. Brian Nelson